**Opinion issued February 23, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00629-CV

———————————

## IN THE INTEREST OF J.H. A/K/A I.J.C.-H. A/K/A J.I.C.H., A CHILD

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2020-02245J

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor child,

J.H., also known as I.J.C.-H. and also known as J.I.C.H. ("J.H."),[2] and awarding the

---

[1]  *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

[2]  There is no dispute that J.H.'s father is deceased.  J.H. was six years old when the
trial court signed its order terminating mother's parental rights.

Department of Family and Protective Services ("DFPS") sole managing conservatorship of J.H. In four issues, mother contends that the trial court erred in appointing DFPS as the sole managing conservator of J.H. and the evidence is legally and factually insufficient to support the trial court's findings that mother knowingly placed, or knowingly allowed J.H. to remain, in conditions or surroundings which endangered his physical or emotional well-being,[3] failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of J.H.,[4] and termination of her parental rights was in the best interest of J.H.[5]

We affirm.

**Background**

On November 30, 2020, DFPS filed a petition seeking termination of mother's parental rights to J.H. and managing conservatorship of J.H.[6]

***Removal Affidavit***

At trial, the trial court admitted into evidence a copy of the affidavit of DFPS investigator Marlena Benitez. Benitez testified that on November 25, 2020, DFPS

---

[3]     *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[4]     *See id.* § 161.001(b)(1)(O).

[5]     *See id.* § 161.001(b)(2).

[6]     DFPS filed a second amended petition seeking termination of mother's parental rights to J.H. and managing conservatorship of J.H. on May 24, 2022.

2

received a referral alleging neglectful supervision of J.H. by mother. J.H., who was four years old at the time, ran out of mother's apartment and was sitting on the street curb in front of his apartment complex for hours. J.H. ran across a main street to a store and stole an ice cream. J.H. then began to walk back across the main street in front of oncoming traffic. A third party was able to stop J.H. and walk him back across the street. The third party walked J.H. to mother's apartment and knocked on the door to return J.H. to mother. When J.H. was back in mother's care, the third party saw mother slap J.H. with a cane.

Following the referral, Benitez, spoke with the third party who returned J.H. to his apartment on November 25, 2020. The third party stated that she and her husband saw J.H. sitting on the street curb in front of an apartment complex. The third party pulled her car over to help J.H. when she saw him "bolt across" a main street through oncoming traffic. J.H. went into a store and came out with an ice cream. The third party went inside the store and paid for the ice cream because J.H.'s parent was not inside the store. The third party then saw J.H. "proceed[] to run across the [main] street with oncoming traffic" again. She stopped J.H. and helped him cross the street safely. She tried to communicate with J.H., but he did not speak English. She followed J.H. through the apartment complex to his door, where she knocked. Mother answered the door, and the third party asked if J.H. was mother's child. Mother stated that he was and told the third party that J.H. was

3

"always running out." As soon as the third party started walking away, mother "slapped [J.H.] across the face with her cane aggressively."

After the November 25, 2020 incident, Benitez also spoke to Danys[7]—mother's oldest adult-son—who told Benitez that he was supposed to ensure that J.H. had a protective caregiver, but on November 25, 2020, mother told Danys that she was depressed and "needed company," so Danys left J.H. with mother instead of taking him to a babysitter when Danys went to work.

Benitez also spoke to mother who stated that J.H. ran out of the apartment on November 25, 2020, while he was under her supervision. Mother denied hitting J.H. with a cane.

Benitez saw J.H. three days after the November 25, 2020 incident and tried to speak to him. But she could not interview him because he was unable to complete a full sentence. J.H. ran around and would not sit still. Benitez saw "marks on" J.H.'s face and "scratches over his body." J.H. was unkempt. His clothes were not clean, his hair was not combed, and it appeared that J.H. did not bathe. J.H.'s teeth were brown and looked rotten. It did not look like J.H. had ever been to a dentist.

As to mother's home, which Benitez saw during her investigation, Benitez testified that it was a one-bedroom apartment. The apartment was cluttered and had broken glass on the floor. J.H. was barefoot in the apartment when there was broken

---

[7]     We note that Danys's name is spelled differently throughout the appellate record.

glass on the floor. The apartment had food and working utilities. The apartment was free of odor, and there was "a chain lock and cables on the door."

Benitez's affidavit also detailed mother's history with DFPS. Previously, there was another allegation of neglectful supervision of J.H. by mother. As to that allegation, the affidavit states that J.H. was living in the apartment with Danys and mother and Danys left J.H. with mother while he went to work. But mother had a stroke about three months prior and had lost mobility in half of her body. Mother admitted that J.H. had left the apartment while he was under her supervision, and she had attempted to run after him but was physically unable to do so. Danys and mother agreed to a "safety plan" with DFPS, which stated that J.H. would no longer be left unsupervised with mother. Danys agreed to pay for a babysitter to take care of J.H. while Danys was at work, and Danys and mother placed new locks on the door to the apartment to try to prevent J.H. from getting out of the apartment.

Benitez ultimately concluded, based on her investigation, that J.H. had managed to get out of mother's apartment on multiple occasions when he was without adequate supervision. Mother was physically unable to care for J.H., as she had suffered a stroke, which left half of her body paralyzed. Because of her stroke, mother had placed the responsibility of J.H.'s care on Danys, her oldest adult-son, who was nineteen years old at the time, and he lacked the maturity and the understanding of DFPS's concerns to keep J.H. safe and unharmed. While in

5

mother's care, J.H. had been put at risk of being hit, injured, or killed because he had been able to leave mother's apartment unsupervised and cross a main street into oncoming traffic. J.H. had been allowed to "roam[] outside of" mother's apartment for several hours without mother or a caregiver knowing his whereabouts. Once J.H. returned home, mother struck him with a cane in his face.

### *DFPS Caseworker Cherry*

DFPS caseworker Jamesha Cherry testified that J.H. was placed with foster parents that wanted to adopt him. J.H. was doing well in his foster parents' home. He was in kindergarten and was adjusting to his new school. J.H. spoke both English and Spanish, and his Spanish-language skills had improved in his placement with his foster parents. J.H.'s kindergarten class was a bilingual class. Cherry explained that J.H. was good at math and was very smart. Cherry noted that when J.H. first entered DFPS's care, he was timid and shy, but now he was "super hyper, super loving" and a "very good boy."

According to Cherry, when J.H. entered DFPS's care, he had a speech delay. He could not speak English or Spanish. J.H. spoke "gibberish." While in DFPS's care, J.H. participated in speech therapy services, and his speech had improved. He was now able to understand what was being asked of him and was able to identify things. He spoke "very well." J.H. did not receive speech therapy services while he was in mother's care.

Cherry also testified that before J.H. entered DFPS's care, he had "never brushed his teeth"; they were rotten and decaying. J.H. had not been receiving dental care while in mother's care, and J.H.'s medical records showed that mother had neglected his dental care for years.[8] Cherry also noted that J.H. had not received any immunizations while in mother's care. And mother did not give a reason for her failure to vaccinate J.H. While in DFPS's care, J.H. had "received extensive dental work." He had "received caps on many teeth and silver caps." His dental work required medical sedation. In his home with his foster parents, J.H.'s dental hygiene had improved, and he now "kn[ew] how to brush his teeth."

As to his current placement, Cherry explained that J.H. was placed with a couple that was married. J.H.'s foster parents were bilingual, and the family had two dogs. J.H.'s foster father worked at a chemical plant, and J.H.'s foster mother was a teacher. J.H. attended the same school where his foster mother taught. There were no other children in the home. According to Cherry, there were no concerns about the foster parents' home, and DFPS's goal was for J.H. to be adopted by his foster parents.

As to mother, Cherry testified that mother had received a Family Service Plan ("FSP"), but she had not completed its requirements. She had not completed her

---

[8] The trial court admitted into evidence copies of J.H.'s medical records related to the dental treatment he received while in DFPS's care.

psychiatric evaluation, parenting classes, or individual counseling. Mother was unsuccessfully discharged from individual counseling because she did not attend her sessions. Mother also failed to maintain contact with DFPS. Cherry was never given a phone number to contact mother; she only received contact information for mother's oldest adult-son Danys. Although mother had received an extension in the case to "allow [her] some additional time" to complete her FSP, at the time of trial, she still had not completed its requirements.

Cherry further noted that mother had been allowed to complete the requirements of her FSP virtually, and the services mother was required to participate in were conducted in Spanish. According to Cherry, mother did complete her psychological evaluation, she had not engaged in any criminal activity,[9] and she had attended court hearings in the case—all of which were requirements of her FSP.

Cherry expressed concern about mother's support system, which consisted of her two adult sons—Danys, who, at the time of trial, was about twenty years old and Romero, who, at the time of trial, was about eighteen years old.[10] Danys and Romero "work[ed] pretty much all day every day," which made it difficult for them to provide mother with support. Before J.H. was removed from mother's care, DFPS

---

[9] Cherry testified that, to her knowledge, mother did not have any "past criminal history."

[10] We note that witnesses testified differently as to Danys's and Romero's ages at the time of trial.

8

"tr[ied] to work with [Danys, who] was [also living] in the home [with mother and J.H.] to alleviate the concern[s]" about J.H. being inadequately supervised, but that effort was not successful.

As to mother's home, Cherry explained that, at the time of trial, mother lived with her two adult sons, Danys and Romero. Danys's girlfriend also lived in the apartment along with her and Danys's child. Cherry did not believe that Danys, Romero, and Danys's girlfriend would be able to help mother take care of J.H. if he was returned to her care because Danys and Romero were "always gone to work" and Danys's girlfriend had recently had her child and "ha[d] not expressed any desire to help care for" J.H. Neither Danys nor Romero had designated anyone in the family who would be responsible for J.H. if he was returned to mother's care. Cherry stated that mother could not care for herself without the help of Danys and Romero. As to the apartment mother was living in with Danys and J.H. when J.H. was removed from mother's care, Cherry stated that it had broken glass on the floor and J.H. was seen barefoot in the apartment.

Cherry also testified that about three months before J.H. entered DFPS's care, mother had a stroke, which left her paralyzed on the left side of her body. At the beginning of the case, mother used a cane to walk. Although, at the time of trial, mother no longer used a cane, she still "walk[ed] fairly slow[ly]." Further, as a result of her stroke, mother "c[ould] only talk so much." Mother was not taking any

9

medications or seeking any sort of treatment or therapy to help her recover from her stroke. She took medications for diabetes, but according to mother, "she[] [was] fine and she d[id] not need anything to help with her aftermath [from] the stroke." Because of mother's health status, Cherry was concerned about mother's ability "to keep up with [J.H.] because he [was] super active and super hyper." Cherry stated that mother's health status prevented her from being able to run after J.H. and prevented her from being able to take J.H. to school.

As to mother's visits with J.H. during the pendency of the case, Cherry testified that mother missed some visits with J.H. For instance, she missed a scheduled visit with J.H. on February 8, 2021, and mother arrived late for her visit with J.H. on February 22, 2021. During the February 22, 2021 visit, mother was "not good emotionally" and cried extensively. Mother arrived late to her visit with J.H. on March 8, 2021, and she was "very emotional" during that visit. Mother did not attend her scheduled visit with J.H. on March 22, 2021, and DFPS did not receive notice from mother that she would not be attending that visit. On June 21, 2021, mother was thirty-five minutes late to her visit with J.H. And mother did not attend her scheduled visit with J.H. on October 25, 2021. Mother attended her visits with J.H. on November 8, 2021 and November 22, 2021. But, at those visits, mother "just kind of looked" at J.H.; she did not speak to him. She "just looked at him."

Cherry further testified that mother attended a visit with J.H. on February 7, 2022. Mother came to a visit with "an unknown male." During the visit, J.H. "just sat at [a] table while [mother] and the unknown male had a conversation." Mother did not attend her scheduled visit with J.H. on April 25, 2022.

Cherry, when asked about mother's interaction with J.H. during her visits, noted that generally mother "would either look at him or just touch him" and J.H. "would eat during the visits" and "that[] [was] pretty much it." Mother would not speak to J.H., but J.H. would speak to mother and "give her a hug." J.H. recognized mother as his mother. Cherry also explained that if Danys attended a visit along with mother, he would speak to J.H., but "most of the time he would be on his [cellular] [tele]phone." When Romero attended visits with mother, he would play with J.H. J.H. talked to Danys and Romero during visits, but he spoke mostly in English, and they did not understand him. J.H. was happy to see Danys and Romero at visits.

Cherry requested, on behalf of DFPS, that the trial court terminate mother's parental rights to J.H. based on mother's failure to complete her FSP and her endangerment of J.H. Cherry noted that J.H. had been removed from mother's care after J.H. had "g[otten] out [of mother's apartment] multiple times unattended" and "cross[ed] main streets" of traffic. One incident happened in October 2020 and a

second incident occurred in November 2020. And mother had not acknowledged any responsibility for those incidents.

As to the November 25, 2020 incident, Cherry explained that J.H., who was about four years old at the time, "g[ot] out" of mother's apartment and "went up to a store and stole an ice cream." Mother was not able to "get him" once he got out of the apartment. After a third party brought J.H. home, mother "struck [him] with a cane."[11]

Despite this occurrence, mother had not provided DFPS's "with concrete steps to alleviate" the concern about J.H. having been previously able to leave mother's apartment unsupervised. DFPS was concerned about mother's ability to supervise J.H. so that he did not "run out of the house" again if he was returned to her care. Cherry did not believe that mother understood why J.H. entered DFPS's care and mother had not made any progress "as far as being able to care for" J.H. According to Cherry, mother was unable to care for J.H. on her own; she could not play with him, throw a ball with him, or walk to the park with him. Mother spent the majority of her time sitting and was unable to chase after J.H. if needed.

### Child Advocates Representative Gonzalez

Child Advocates, Inc. ("Child Advocates") representative Esther Gonzalez testified that it was in the best interest of J.H. for mother's parental rights to be

---

[11]    Cherry noted that J.H. did not have any visual marks from being struck in the face.

terminated and for J.H. to be adopted by his foster parents because J.H. was doing well in his foster parents' home and his foster parents were taking good care of him. Gonzalez did not believe that mother was capable of providing the same level of care to J.H.

Gonzalez explained that when J.H. entered DFPS's care he was not clean and his teeth were "rotten." But, while in DFPS's care, J.H.'s speech had improved and his medical needs had been addressed. At the time of trial, J.H. had been living with his foster parents for about two months, and Gonzalez described his placement with his foster parents as an adoptive placement for J.H.

As to mother, Gonzalez testified that mother was unable to communicate with her; when Gonzalez tried to asked mother questions, mother did not appear to understand. Mother had failed to attend in-person individual counseling sessions that mother had requested be set up by DFPS because she was having difficulty attending her counseling sessions virtually. Because mother had not participated in counseling, she had not been able to address the reasons that J.H. had entered DFPS's care. If J.H. was returned to mother's care, Gonzalez did not think that mother, who did not drive, would be able to take J.H. to the doctor on her own or that she would be able to get J.H. to school. While J.H. had been in DFPS's care, mother had not asked about J.H.'s health or dental hygiene.

13

The last time that mother saw J.H. she appeared happy to see him, and J.H. appeared happy to see her. But during the visit mother "just s[at] there." Romero and J.H. played with cars during the visit, and Romero got J.H. snacks from the vending machine. Romero and J.H. appeared to have a good relationship. Gonzalez noted that during another visit that she observed, mother was "very upset and crying" and Danys was "on the [tele]phone." And at another visit, mother sat and watched J.H., but there was "little interaction between them," and Danys spent most of the visit on his cellular telephone.

Gonzalez testified that at the time of trial, mother was living in an apartment with Danys, Romero, Danys's girlfriend, and Danys's infant child, and Romero. As to potential supervision for J.H. should he be returned to mother's care, Danys and Romero had spoken to Gonzalez about having Danys's girlfriend approved as a babysitter for J.H. But Gonzalez noted that the girlfriend had an infant child, who was ten months old, and she also babysat two other children who were toddlers. Notably, no one in mother's family had identified themselves as the person who would be a primary caretaker for J.H., i.e., the person who would be "the full-time responsible person" for J.H., if he was returned to mother's care. Gonzalez did not believe that mother was capable of being J.H.'s primary caretaker due to her previous stroke, and mother had failed to provide any medical releases to DFPS or Child Advocates to allow them to ascertain whether mother had received any treatment to

14

address her limitations following the stroke. Gonzalez also noted that Danys, who was about twenty or twenty-one years old at the time of trial, and Romero, who was about eighteen years old at the time of trial, both worked Monday through Saturday, so they would not be able to serve as a primary caretaker for J.H.

### *Child Advocates Representative Delgado*

Child Advocates representative Mabel Delgado testified that she had visited J.H. in his current placement with his foster parents. The foster parents had a ranch-style house on acreage, with a large front yard. The home had three or four bedrooms, a dining room, kitchen, and family room. The property had a fence that encircled the entire property. The foster parents had two dogs, and J.H. was the only child living in the home.

Delgado further explained that J.H.'s foster mother was a teacher at the same school that J.H. attended. J.H. appeared to be happy at school, but he struggled in his Spanish-only-speaking class. J.H.'s foster mother said that she and J.H.'s foster father were going to place him in an English-only-speaking class in the upcoming school year and she was going to work with J.H. during the summer to make sure that he was on target. His foster mother wanted to make sure that J.H. did not fall behind in school. J.H. told Delgado that he was sad that it was summer and he was not at school.

Delgado testified that J.H. was happy and comfortable in the home with his foster parents. He was very talkative and "bounc[ed] around" during Delgado's most recent visit with him. Delgado spoke to J.H. in both Spanish and English, and J.H. responded to her in either Spanish or English. J.H. played soccer. His foster parents had flash cards, writing tablets, books, and toys for J.H. J.H. told Delgado that his foster mother helped him brush his teeth.

According to Delgado, J.H. interacted with his foster parents "really well." He referred to his foster mother as "mom" and his foster father as "dad." He sat on his foster father's lap during Delgado's visit with him.

Delgado noted that J.H. seemed calmer in his foster parents' care. His foster parents stated that they had been working with him on manners and sitting at the table to eat.

### Mother's oldest adult-son

Danys, who was about twenty-one years old at the time of trial, testified that mother took care of him while he was growing up as well as his siblings. When Danys was young, mother worked and paid for a babysitter to take care of him and his siblings, but when Danys's sister became old enough, she took care of Danys and his siblings while mother worked. Mother "always worked," but she prepared lunch and dinner for him and took him to doctor appointments. Mother "educate[d] [Danys] to be good with other people and also [to] be polite . . . with those [people

who were] older."  In 2018, Danys moved to Houston, Texas from El Salvador to find a job so that he had money for himself and money to give to mother.  Danys testified that he worked either five or six days a week, from 6:30 a.m. until 2:30 p.m., but on some days, he had to stay later than 2:30 p.m.

When J.H. was a baby and still living in El Salvador, mother took care of him, but when J.H. turned eight months old, Danys's sister began caring for J.H.  According to Danys, mother, and sometimes Danys's sister, would take J.H. to the doctor when he was sick.

At some point, when J.H. was about three years old, mother and J.H. moved to the United States so that mother could live with "her partner" in Dallas, Texas.  J.H. lived with mother in Dallas.  Mother moved to Houston to live with Danys after she had a stroke in 2020.  According to Danys, mother spent "20 days in a coma" and was "unable to speak."  When mother moved to Houston, she was doing "very poorly."  She was unable to walk or talk and could not bathe independently.  Mother did not receive any rehabilitation services following her stroke, and she did not "receive any medical treatment . . . in Houston for the effects of her stroke."

Danys testified that by the time of trial mother's condition had improved.  She "talk[ed] better" and no longer needed "her walking stick or [her] wheelchair."  But she still had difficult moving one of her hands; she could move her hand, but not very well.  Mother was able to understand sentences and could go outside her

17

apartment alone. She could dress herself, put on makeup, and walk to buy food from a nearby store. According to Danys, mother did not know how to drive a car.[12] Mother only took medication for diabetes.

As to his living situation, Danys stated that he lived with his girlfriend and their child along with mother and Romero[13] in an apartment. The apartment had two bedrooms. The goal was to have mother and J.H. live in one bedroom and Danys, his girlfriend, and their child would live in the other bedroom. Danys stated that the family could buy a bed so that J.H. and mother had their own beds in which to sleep. Romero would sleep on the couch. According to Danys, his girlfriend stayed at home caring for their child and she was willing to take care of J.H. But Danys's girlfriend also watched one or two other children and took care of mother while Danys was at work. Danys was responsible for paying rent for the apartment. There were not locks on the door to the apartment, but if J.H. was returned to mother's care, the family would put a lock on the door so that J.H. would not be able to get out.

Danys also explained that previously, before J.H. entered DFPS's care, J.H. had gotten out of the apartment and a "safety plan" was put in place under which

---

[12] Danys stated that he did drive a car, but he did not have a driver's license. Romero, mother's second-oldest adult-son, could also drive a car, but he did so without a driver's license.

[13] Danys explained that Romero, who was nineteen years old at the time of trial, worked from 7:00 a.m. to 8:00 p.m.

Danys was supposed to supervise J.H. and not leave him alone with mother. But in November 2020, when J.H. escaped the apartment for a second time, Danys had left J.H. with mother while he went to work because mother said that she "was feeling lonely and she wanted to be with [J.H.]." Danys trusted mother to supervise J.H. that day, but J.H. got out of the apartment alone because he was able to unlock the door. J.H. was not wearing a shirt or socks. Although Danys's girlfriend was also at the apartment when J.H. got out unsupervised, she was pregnant and was "unable to walk." Danys's girlfriend called him to tell him that J.H. had left the apartment. Mother did not call him because she could not speak very well.

As to the condition of J.H.'s teeth when J.H. entered DFPS's care, Danys stated that they "bec[a]me black" because mother had been "giving him some iron pills" and his teeth were "not washed well." Danys bought J.H. a toothbrush to brush his teeth with, but the "darkness" did not come off or get better. J.H.'s teeth were "very bad" and Danys knew that J.H. needed to see a dentist, but he was unable to take him to see one. No one in the family ever took J.H. to the dentist.

Danys described J.H. as a hyperactive child and stated that they used to play football and go on walks. He and J.H. loved each other. Danys did not attend all visits with J.H. because he had to work. Danys had difficulty communicating with J.H. at visits because J.H. only wanted to speak English. Mother and J.H. would hug at the visits, but when mother would get emotional, J.H. would get emotional as well.

19

As to mother's FSP, Danys stated that he was aware that mother was required to complete certain requirements listed on her FSP. But he had difficulty helping her because he spent all day working. And mother had a difficult time communicating on the telephone.

According to Danys, if J.H. was returned to mother's care, J.H. would live in a bedroom with mother, and Danys's girlfriend would supervise J.H. and take him to school. Mother could not supervise J.H. alone without additional help. Danys's girlfriend was willing to help with J.H. "because there[] [was] not another person that could do it." Either Danys or Romero would be responsible for taking J.H. to doctor appointments or dentist appointments. Mother was unable to live independently and could not take J.H. to appointments by herself.

*Mother*

Mother testified that she had raised five children by herself and she had never hit J.H. At the time of trial, mother lived with her two adult sons, Danys and Romero, as well as Dany's girlfriend and Danys's child. J.H. had a good relationship with Danys and Romero, and they had "engage[d] in activities together." According to mother, Danys could take care of J.H. if he was returned to mother's care or Danys's girlfriend could take care of J.H. Mother did not have any other family members that could help care for J.H.

20

As to her visits with J.H., mother stated that J.H. could not speak Spanish and she could not speak English, so she could not communicate with him through speaking. But mother acknowledged that J.H.'s foster parents spoke Spanish to him as did the Child Advocates representative. J.H. liked having visits with Danys and Romero. Mother's most recent visit with J.H. was on May 27, 2022.

As to the reason J.H. entered DFPS's care, mother acknowledged that J.H. "ran away" from her apartment and he was in danger when he ran "into traffic." There were two incidents where J.H. left mother's apartment unsupervised. According to mother, she saw J.H. open the door and run out of the apartment, but she could not walk. Mother notified Danys's girlfriend who then called Danys.

Mother testified that she had received an FSP, but she had to rely on Danys to take her to complete certain services. She could not take the bus alone.

As to her limitations related to her health status, mother stated that, at the time of trial, she could go shopping and buy food by herself at a store that was not far away from her apartment. And, according to mother, her condition had improved. But she acknowledged that she needed the help of her attorney to walk in the courtroom. Mother did not know the address of the apartment that she lived at or the name of the apartment complex where she lived. Mother admitted that she would need help caring for J.H. if he was returned to her care. She did not know what grade

21

J.H. would be entering in the fall. Mother did not receive medical services following her stroke.

As to J.H., mother acknowledged that his care and safety were the most important things. Mother did not take J.H. to the dentist or to the doctor when he was previously in her care.

***Mother's FSP***

The trial court admitted into evidence a copy of mother's FSP. The FSP states that DFPS wanted J.H. to be happy and reach his fullest potential in a safe and stable environment free from hazards, narcotics, and violence.

As to J.H., the FSP states that he had a good relationship with Danys. As to mother, the FSP states that she previously suffered a stroke that left half of her body paralyzed. Mother lived with Danys, and it was unknown if she had any previous or current substance abuse issues.

The FSP further states that mother, while J.H. was in her care, "continue[d] to leave [J.H.] without . . . appropriate parental care or adult supervision" placing him at risk of danger and possible neglect. Mother needed to be able to show that J.H. would be "in [the] protective care and supervision of adults he fe[lt] safe and comfortable with" and that J.H. would be disciplined without the use of physical harm.

Under her FSP, mother was required to, among other things: (1) maintain contact with her DFPS caseworker, including participating in monthly face-to-face visits with the DFPS caseworker; (2) obtain and maintain safe and stable housing and provide proof of housing; (3) maintain a home that was free of hazards and unsanitary conditions; (4) maintain regular employment or financial stability and provide proof of income in the form of paycheck stubs to the DFPS caseworker; (5) gain and maintain a reliable support system and update the DFPS caseworker with her support system information; (6) participate in a psychosocial evaluation and follow all recommendations of the evaluation; (7) sign a release of information for DFPS; (8) refrain from engaging in criminal activity; and (9) attend all court hearings and permanency conferences.

### *May 2022 Permanency Report*

The trial court admitted into evidence a copy of a May 2022 permanency report filed by DFPS. As to J.H., the permanency report states that he had been in his current adoptive placement with his foster parents since March 2022. J.H. was adjusting to his foster parents' home, and he was eating and sleeping well. He was a bright, sweet, and happy child, who enjoyed playing with toys and meeting new people. J.H. was hyperactive and learning to follow the rules when he did not get his way. J.H. was the only child living in his foster parents' home. J.H. had attended medical and dental appointments while in the care of his foster parents.

23

Further, the permanency report states that J.H. was attending kindergarten and he was adjusting well to his school and learning a lot. J.H. was in a bilingual class at school. He was learning Spanish at school and in speech therapy at home, but he preferred to speak English. Based on his mental health assessment, it was recommended that J.H.'s caregivers provide him with a nurturing, structured, and consistent environment. J.H.'s caregivers should provide age-appropriate play and learning activities to promote J.H.'s developmental progress. J.H. should attend dental appointments regularly to promote and maintain good dental hygiene and health. J.H. did not take any medications.

As to mother, the permanency reports states that she missed a scheduled visit with J.H. on February 8, 2021, and she did not notify the DFPS caseworker that she would not be attending the visit. Mother and Danys arrived late for a visit with J.H. on February 22, 2021. Mother, Danys, and Danys's girlfriend arrived late to a visit with J.H. on March 8, 2021, and on March 22, 2021, mother did not show up for her visit with J.H. and did not notify the DFPS caseworker that she would not be attending the visit. Mother and Danys attended a visit with J.H. on April 12, 2021. On May 10, 2021, mother and Danys attended a visit with J.H., but mother did not speak to J.H. much. Mother and Danys gave J.H. something to eat and drink and the visit "went well." On June 7, 2021, mother and Danys attended a visit with J.H., but mother did not speak much to J.H. Again, mother and Danys gave J.H. something

24

to eat and drink.  On June 21, 2021, mother showed up to her visit with J.H. more than thirty-minutes late, and she did not say much.  On July 5, 2021, mother and Danys attended a visit with J.H., but mother did not speak much to J.H.  Mother and Danys gave J.H. something to eat and drink and the visit "went well."  On July 19, 2021, mother, Danys, and Romero attended a visit with J.H.  On August 9, 2021, August 23, 2021, September 27, 2021, and October 11, 2021, mother attended visits with J.H.  Mother cancelled her visit with J.H. on October 25, 2021 because Danys had to work.  During her two visits with J.H. in November 2021, mother did not speak much to J.H., but just looked at him.  On January 24, 2022, mother attended a visit with J.H., but mother cried throughout the visit.  While mother cried, J.H. "rub[bed] her and sa[id] it[']s ok."  At her February 7, 2022 visit with J.H., mother came with an unknown male.  Mother and the unknown male did not engage with J.H. and instead had their own conversation.  Mother and Danys arrived late to their visit with J.H. on February 28, 2022.  Mother and Romero attended a visit with J.H. on April 11, 2022, but mother missed her visit with J.H. on April 25, 2022.

As to mother's FSP, the permanency report states that mother completed her psychological evaluation on June 4, 2021, but mother did not complete any of the recommendations from her evaluation.  On March 8, 2022, mother completed a psychosocial evaluation, which recommended that mother participate in individual counseling.  On April 21, 2022, mother was unsuccessfully discharged from

25

individual counseling because of her consistent "no-shows." Mother did not complete the required psychiatric evaluation.

### *Child Advocates Report*

The trial court admitted into evidence a copy of a May 2022 Court Report by Child Advocates (the "Child Advocates report"). The Child Advocates report recommended that DFPS be given permanent managing conservatorship of J.H. and that mother's parental rights be terminated. According to the report, on November 25, 2020, DFPS received an allegation of neglectful supervision of J.H. by mother. J.H. ran out of mother's apartment and sat on the curb outside for hours in front of the apartment complex on a main street. J.H. then ran to a store across the main street and stole an ice cream. J.H. went back across the main street in front of oncoming traffic. A third party was able to stop J.H. from crossing the main street and walked him back to mother's apartment. The third party returned J.H. to mother and saw mother slap J.H. with a cane.

The Child Advocates report further notes that before the November 25, 2020 incident, DFPS had previously received an allegation of neglectful supervision of J.H. by mother. Related to that incident, Danys left J.H. with mother when he went to work, and J.H. left mother's apartment while he was under mother's supervision. Because of mother's stroke, she had lost mobility in half of her body, and although she attempted to go after J.H., she was not physically able to do so. As a result,

26

Danys and mother signed a "safety plan stating that [J.H.] w[ould] no longer be left unsupervised with [mother]" and that Danys would pay for a babysitter to watch J.H. while Danys was at work.

As to mother, the Child Advocates report states that she, as part of her FSP, was required to maintain safe and stable housing, complete a psychological evaluation and follow its recommendations, and establish and maintain a strong support system. Mother completed a psychological evaluation in June 2021, and she was diagnosed with major depressive disorder. As a result of the evaluation, it was recommended that mother undergo an evaluation to determine if medication management was appropriate to address her symptoms and that mother attend individual counseling "to address past traumas, improve mood regulation and distress tolerance, and provide support as she navigate[d] recovering from [her] stroke." It was also recommended that mother participate in parenting classes and occupational therapy to help her recover from paralysis related to her stroke. Mother had not followed the recommendations of her psychological evaluation.

On March 8, 2022, mother completed a psychosocial evaluation, which recommended that she participate in individual counseling and a psychiatric assessment. Mother was unsuccessfully discharged from individual counseling because she repeatedly missed counseling sessions, and she had not completed her psychiatric assessment.

27

The report further states that mother relied on Danys for financial support. Mother lived with Danys, Romero, Danys's girlfriend, and Danys's infant child in an apartment. After mother's stroke, Danys appeared to take over parental responsibility for J.H. Although representatives from Child Advocates had attempted to speak with mother about the status of the case and permanency options for J.H., mother had limited speech due to her stroke and she had difficulty communicating verbally. Mother did not provide contact information for any medical doctors treating her limitations related to her stroke, and it was unknown whether mother was receiving treatment to help her recover from the paralysis she sustained as a result of her stroke.

As to J.H.'s current placement, Child Advocates recommended that J.H. remain in his current placement because his foster parents were meeting his needs and he appeared to be comfortable in the home. J.H. was eating and sleeping well, and he had adjusted to school. J.H.'s foster parents had expressed a desire to adopt J.H.

## Sufficiency of Evidence

In her first, second, and third issues, mother argues that the trial court erred in terminating her parental rights to J.H. because the evidence is legally and factually insufficient to support the trial court's findings that that mother knowingly placed, or knowingly allowed J.H. to remain, in conditions or surroundings which

endangered his physical or emotional well-being, she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of J.H., and termination of her parental rights was in the best interest of J.H. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (O), (b)(2).

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree

of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we

30

must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *See id.*; *Tex. Dep't of Human*

31

*Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A.  Endangerment

In portions of her first and second issues, mother argues that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights to J.H. under Texas Family Code section 161.001(b)(1)(D) because although J.H., while in mother's care, was able to "unlock the door to the family's apartment and make an exit," "[n]o harm ever came to J.H."; there was no evidence of narcotics use by mother or any family member living with J.H.; and there was "no history of abuse by anyone." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "knowingly placed or knowingly allowed [a] child to remain in conditions or surroundings which endanger[ed] [his] physical or emotional well-being." *Id.* To "endanger" means to expose the child to loss or injury or to jeopardize his emotional or physical health. *Boyd*, 727 S.W.2d at 533 (internal quotations omitted); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (internal quotations omitted). A child is endangered when the environment creates

a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Fam. & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. However, it is not necessary that the endangering conduct be directed at the child or that the child actually suffer injury. *Id.*

Texas Family Code section 161.001(b)(1)(D) focuses on a child's surroundings and environment and requires a showing that the environment in which the child was placed endangered his physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied); *see also In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d at 477. "Environment" refers to the acceptability of the child's living conditions as well as the conduct of a parent or other person in the home because the conduct of a parent or other person can create an environment that endangers the child's physical or emotional well-being. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (internal quotations omitted); *see also In re I.L.L.*, No. 14-09-00693-CV, 2010 WL 4217083, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). For instance,

inappropriate, unlawful, abusive, or violent conduct by a parent or other person living in the child's home is a part of the "conditions or surroundings" of the child's home and may produce an environment that endangers his physical or emotional well-being. *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *12 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (internal quotations omitted); *In re M.R.J.M.*, 280 S.W.3d at 502 (internal quotations omitted); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Thus, although Texas Family Code section 161.001(b)(1)(D) focuses on a child's living environment, parental conduct may produce an endangering environment. *See In re A.A.H.*, Nos. 01-19-00612-CV, 01-19-00748-CV, 2020 WL 1056941, at *9 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.).

The relevant time frame for establishing that a parent knowingly placed, or allowed a child to remain, in conditions or surroundings which endangered his physical or emotional well-being is prior to the child's removal. *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). And a fact finder may infer from a parent's past conduct endangering the well-being of the child that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *see also In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (trier of fact may measure

parent's future conduct by his past conduct). Notably, DFPS does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *In re A.A.H.*, 2020 WL 1056941, at \*9. Texas Family Code section 161.001(b)(1)(D) permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

According to DFPS investigator Benitez, on November 25, 2020, J.H., who was four years old at the time, got out of mother's apartment unsupervised and sat on the street curb in front of the apartment complex for hours. He also ran across a main street through oncoming traffic to a store and stole an ice cream. He began walking back across the main street in front of oncoming traffic, until a third party stopped him and helped him walk back across the street. The third party then walked J.H. back to mother's apartment and knocked on the door. Mother told the third party that J.H. was "always running out." When J.H. was back in mother's care, the third party saw mother slap J.H. "across the face with her cane aggressively."[14] Mother admitted that J.H. ran out of the apartment on November 25, 2020, while he was under her supervision.

During her investigation, Benitez determined that the above-described incident was not the first time that J.H. had gotten out of mother's apartment

---

[14] DFPS caseworker Cherry gave similar testimony when describing the November 25, 2020 incident.

35

unsupervised, but rather J.H. had managed to leave the apartment unsupervised on multiple occasions.[15] J.H. had been allowed to "roam[] outside of" mother's apartment for several hours without mother or a caregiver knowing his whereabouts.

Mother testified that there were two incidents where J.H. left her apartment unsupervised. And mother acknowledged that J.H. "ran away" from her apartment and he was in danger when he ran "into traffic." Mother saw J.H. open the door and run out of the apartment, but she could not walk so she did not follow him.

A parent's failure to properly supervise her young child endangers the child's physical or emotional well-being. *See In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *10–11 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.) (parent's failure to supervise her child created dangerous condition for child); *In re J.H.*, No. 07-21-00059-CV, 2021 WL 2693284, at *3 n.4 (Tex. App.—Amarillo June 30, 2021, pet. denied) (mem. op.); *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *14 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.). And evidence that a parent has failed to supervise her young child supports the trial court's finding that the parent "knowingly placed or knowingly allowed [her] child to remain in conditions or surroundings which endanger[ed] [his] physical or

---

[15] DFPS caseworker Cherry similarly testified that J.H., before entering DFPS's care, had "g[otten] out [of mother's apartment] multiple times unattended" and "cross[ed] main streets" of traffic. Mother had not acknowledged any responsibility for those incidents.

emotional well-being." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *see also In re I.F.*, No. 01-22-00375-CV, 2022 WL 16640627, at *5 (Tex. App.—Houston [1st Dist.] Nov. 3, 2022, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support trial court's finding that parent knowingly placed or knowingly allowed her child to remain in conditions or surroundings that endangered her physical or emotional well-being where parent left child unsupervised in hotel room); *In re L.B.*, No. 09-21-00224-CV, 2022 WL 174413, at *7 (Tex. App.—Beaumont Jan. 20, 2022, no pet.) (mem. op.); *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *13–15 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.).

Further, a parent's neglect of her child's medical or dental needs endangers the child. *See In re J.H.*, 2021 WL 2693284, at *3 n.4; *In re J.A.J.*, No. 04-20-00156-CV, 2020 WL 4929797, at *3 (Tex. App.—San Antonio July 29, 2020, no pet.) (mem. op.) (medical neglect endangers a child's physical well-being); *In re A.A.H.*, 2020 WL 1056941, at *12; *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) (parent's lack of attention to child's medical needs is evidence that may prove endangerment); *see also In re L.C.*, 145 S.W.3d 790, 796 (Tex. App.—Texarkana 2004, no pet.) ("[e]ndanger" includes jeopardizing child's physical or emotional well-being (internal quotations omitted)). And evidence that a parent has neglected her child's medical or dental needs supports a trial court's finding that the parent "knowingly placed or knowingly allowed [her] child to

37

remain in conditions or surroundings which endanger[ed] [his] physical or emotional well-being." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *see also In re E.A.D.*, No. 14-22-00025-CV, 2022 WL 2663981, at *5 (Tex. App.—Houston [14th Dist.] July 11, 2022, no pet.) (mem. op.) (evidence of parent's actions, including neglecting child's medical condition, supported trial court's finding that parent knowingly placed or knowingly allowed child to remain in conditions or surroundings that endangered her physical or emotional well-being); *In re J.H.*, 2021 WL 2693284, at *3 n.4; *In re N.P.*, No. 09-20-00218-CV, 2021 WL 203339, at *6–7 (Tex. App.—Beaumont Jan. 21, 2021, pet. denied) (mem. op.) (evidence sufficient to support trial court's finding parent knowingly placed or knowingly allowed her child to remain in conditions or surroundings which endangered her physical or emotional well-being where record contained evidence of child's unaddressed dental issues); *In re J.A.J.*, 2020 WL 4929797, at *2–3 (holding evidence legally and factually sufficient to support trial court's finding that parent knowingly allowed her children to live in conditions and surroundings which endangered their physical and emotional well-being where parent neglected children's medical needs); *In re A.A.H.*, 2020 WL 1056941, at *13 (holding evidence legally and factually sufficient to support trial court's finding that parent knowingly allowed child to remain in conditions that endangered her physical or emotional well-being where evidence showed parent neglected medical needs of another child in home); *In re I.W.*, No.

38

12-19-00027-CV, 2019 WL 2710275, at *8 (Tex. App.—Tyler June 28, 2019, pet. denied) (mem. op.) (where evidence showed parent's on-going failure to address child's therapeutic needs, scalp infection, dental issues, and developmental delays, holding evidence sufficient to support trier of fact's finding that parent knowingly placed or knowingly allowed child to remain in conditions or surroundings which endangered her physical or emotional well-being).

According to Benitez, when she saw J.H. three days after the November 25, 2020 incident, his teeth were brown and looked rotten, and it did not appear that he had ever been to the dentist.[16] Further, J.H. could not complete a full sentence when she tried to speak with him.

DFPS caseworker Cherry similarly testified that while J.H. was in mother's care, he "never brushed his teeth" and they were rotten and decaying when he entered DFPS's care in November 2020. J.H. did not receive any dental care while he was in mother's care, and his medical records showed that mother had neglected his dental care for years. J.H. also had not received any immunizations while in mother's care, and mother did not give Cherry a reason for her failure to vaccinate J.H. Because J.H. had not received any dental care while in mother's care, when he

---

[16]     Child Advocates representative Gonzalez also testified that when J.H. entered DFPS's care, his teeth were "rotten."

39

entered DFPS's care, he needed "caps on many of his teeth and silver caps." And his dental work required medical sedation.

Cherry also testified that when J.H. entered DFPS's care, he could not speak English or Spanish. He spoke "gibberish." And while he had been in mother's care, he had not received any speech therapy services.

Danys, mother's oldest adult-son, testified that when J.H. entered DFPS's care, his teeth were "black" because mother had given J.H. "iron pills" and J.H.'s teeth were "not washed well." Danys bought J.H. a toothbrush, but the "darkness" did not come off or get better. According to Danys, J.H.'s teeth were "very bad" and Danys knew that J.H. needed to see a dentist, but no one in the family ever took J.H. to the dentist. Mother testified that she never took J.H. to the dentist or to the doctor while he was in her care.

Additionally, evidence of unsanitary and dangerous conditions in a child's home as well as evidence that a parent has neglected her child's physical condition supports a trial court's finding that the parent "knowingly placed or knowingly allowed [her] child to remain in conditions or surroundings which endanger[ed] [his] physical or emotional well-being." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *see also In re S.B.*, 597 S.W.3d 571, 584 (Tex. App.—Amarillo 2020, pet. denied) ("Allowing children to live in unsanitary conditions and neglecting their physical condition can constitute endangerment."); *In re L.S.*, No. 13-18-00632-CV, 2019

40

WL 1474521, at *7–8 (Tex. App.—Corpus Christi–Edinburg Apr. 4, 2019, pet. denied) (mem. op.) (environment endangered child where parent's apartment had broken glass on floor and child was barefoot and dirty); *In re E.W.*, No. 10-16-00132-CV, 2017 WL 4079713, at *5 (Tex. App.—Waco Sept. 13, 2017, no pet.) (mem. op.) (considering cleanliness of children in holding evidence sufficient to support finding parents placed or allowed children to remain in conditions endangering their emotional or physical well-being); *In re D.M.*, 452 S.W.3d 462, 469–70 (Tex. App.—San Antonio 2014, no pet.) (holding evidence legally and factually sufficient to support trial court's endangerment finding where parent knowingly left child in unsanitary and dangerous conditions); *In re A.T.*, 406 S.W.3d 365, 371–72 (Tex. App.—Dallas 2013, pet. denied) (poor hygiene may constitute condition that endangers child's physical and emotional well-being); *In re C.M.W.*, No. 01-02-00474-CV, 2003 WL 579794, at *3–4 (Tex. App.—Houston [1st Dist.] Feb. 27, 2003, no pet.) (mem. op.) (children were dirty, had poor hygiene, and offensive body odors).

DFPS investigator Benitez stated that when she saw J.H. three days after the November 25, 2020 incident, J.H.'s clothes were not clean, his hair was not combed, and it appeared that J.H. did not bathe. As to mother's apartment, Benitez stated that it was cluttered. There was broken glass on the floor, and J.H. was barefoot in the

41

apartment.[17]  Child Advocates representative Gonzalez testified that J.H. was not clean when he entered DFPS's care.  And Danys noted that when J.H. left mother's apartment on November 25, 2020, he was not wearing a shirt or socks.

Finally, we reiterate that inappropriate, unlawful, abusive, or violent conduct by a parent is a part of the "conditions or surroundings" of the child's home and may produce an environment that endangers his physical or emotional well-being.  *In re K.C.F.*, 2014 WL 2538624, at *12; *In re M.R.J.M.*, 280 S.W.3d at 502 (internal quotations omitted); *In re J.T.G.*, 121 S.W.3d at 125; *see also In re A.A.H.*, 2020 WL 1056941, at *9  (although Texas Family Code section 161.001(b)(1)(D) focuses on a child's living environment, parental conduct may produce an endangering environment).   And Texas Family Code section 161.001(b)(1)(D) permits termination based upon a parent's single act or omission.  *Jordan*, 325 S.W.3d at 721.

DFPS investigator Benitez explained, related to the November 25, 2020 incident, that when the third party walked J.H. back to mother's apartment, the third party saw mother slap J.H. "across the face with her cane aggressively."[18]  And when Benitez saw J.H. three days later, she saw "marks on" J.H.'s face and "scratches over

---

[17]    DFPS caseworker Cherry also testified that mother's apartment, where J.H. was living before entering DFPS's care, had broken glass on the floor and J.H. was seen barefoot in the apartment.

[18]    DFPS caseworker Cherry gave similar testimony when describing the November 25, 2020 incident.

his body." *See In re I.W.*, 2019 WL 2710275, at *7 (abusive or violent conduct by parent may produce environment that endangers child's physical or emotional well-being).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed J.H. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed J.H. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See id.* Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that mother knowingly placed, or knowingly allowed J.H. to remain, in conditions or surroundings which endangered his physical or emotional well-being or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that mother knowingly placed, or knowingly allowed J.H. to remain, in conditions or surroundings which endangered his physical or emotional well-being.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother knowingly placed, or knowingly allowed

43

J.H. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See id.*

We overrule a portion of mother's first and second issues.

As previously noted, only one predicate finding under Texas Family Code section 161.001(b)(1) is necessary to support termination of mother's parental rights to J.H. *See In re A.V.*, 113 S.W.3d at 362. Accordingly, having held that the evidence is legally and factually sufficient to support the trial court's finding, under Texas Family Code section 161.001(b)(1)(D)—that mother knowingly placed, or knowingly allowed J.H. to remain, in conditions or surroundings which endangered his physical or emotional well-being—we need not address the remaining portions of mother's first and second issues in which she argues that the evidence is legally and factually insufficient to support the trial court's finding, under Texas Family Code section 161.001(b)(1)(O), that mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of J.H. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re A.V.*, 113 S.W.3d at 362; *Walker*, 312 S.W.3d at 618; *see also* TEX. R. APP. P. 47.1.

## B. Best Interest

In her third issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of J.H. because "neither sympathy nor empathy entered the

[trial court's] decision-making process," mother had "successfully raised her older children," "J.H. had never been placed out of his home prior to the instant case," there was no evidence of J.H. being harmed by mother or that J.H. was afraid of returning home, mother did not have a history of substance abuse, mother's apartment was safe, mother's family members were "ready and willing to do what was necessary to have J.H. returned to them," J.H. was not malnourished, and there was no evidence that J.H. was exposed to violence or that mother did not understand J.H.'s needs. Further, mother asserted that her visits with J.H. went well, she participated in the majority of her visits with J.H., J.H.'s only needs that were not being met while in mother's care were his "dental needs," and mother was "making progress" after her stroke.

The best-interest analysis evaluates the best interest of the child. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent placement of the child in a safe environment is in his best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination

45

proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at \*20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of mother's parental rights was in the best interest of J.H., we may consider several factors, including: (1) the desires of J.H.; (2) the current and future physical and emotional needs of J.H.; (3) the current and future emotional and physical danger to J.H.; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for J.H. by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at \*6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of

evidence about some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J.G.S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. Child's Desires

When mother's parental rights were terminated, J.H. was six years old. He did not directly express a desire as to whether he wished to return to mother's care or remain in the care of his foster parents.

When there is no specific evidence of a child's desires and a child is too young to express those desires, a fact finder may consider evidence that the child is bonded with his foster family and receives good care in his current placement. *See In re*

*L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *20 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). DFPS caseworker Cherry testified that J.H. was doing well in his foster parents' home, and while in the care of his foster parents, J.H.'s dental hygiene had improved. He now "kn[ew] how to brush his teeth." J.H.'s foster parents wanted to adopt him.

Child Advocates representative Gonzalez similarly testified that J.H. was doing well in his foster parents' home and his foster parents were taking good care of him. Further, Child Advocates representative Delgado explained that J.H.'s foster mother was a teacher at the same school that J.H. attended. J.H. appeared to be happy at school, and his foster mother planned to work with J.H. over the summer to make sure that he was on target for the next school year. J.H.'s foster mother wanted to make sure that he did not fall behind in school. Further, according to Delgado, J.H. was happy and comfortable in his home with his foster parents. J.H.'s foster parents had flash cards, writing tablets, books, and toys for J.H., and J.H. told Delgado that his foster mother helped him brush his teeth.

Delgado also testified that J.H. interacted with his foster parents "really well," and he referred to his foster mother as "mom" and his foster father as "dad." J.H. sat on his foster father's lap during Delgado's visit with him. *See In re S.H.*, No.

01-22-00255-CV, 2022 WL 17254956, at *14 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) (child's bond with placement family implies child's desire would be fulfilled by adoption by placement family). According to Delgado, J.H. appeared calmer in the care of his foster parents. J.H.'s foster parents told Delgado that they had been working with J.H. on manners and sitting at the table to eat.

Further, according to DFPS's May 2022 permanency report, J.H. was eating and sleeping well at his foster parents' home. And his foster parents had taken him to medical and dental appointments. The report also notes that J.H. was attending kindergarten and he was adjusting well to his school and learning a lot. *See In re L.M.N.*, 2018 WL 5831672, at *20 (considering evidence children doing well in placement with foster parents, who were meeting children's needs); *In re M.L.R-U., Jr.*, 517 S.W.3d 228, 238 (Tex. App.—Texarkana 2017, no pet.) (considering evidence foster family provided safe and healthy environment when determining children's desires).

There is also evidence that J.H. was happy to see mother and his older brothers at visits and that J.H. had a good relationship with his brothers. However, mother also missed visits with J.H., was late to certain visits with J.H., and failed to interact with J.H. at certain visits. We note that even when a child is attached to a parent, his desire to be returned to the parent's care is not dispositive of the best-interest

analysis. *See In re D.R.L.*, No. 01-15-00733-CV, 2016 WL 672664, at *5 (Tex. App.—Houston [1st Dist.] Feb. 18, 2016, no pet.) (mem. op.); *see also In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (considering evidence that parent missed visits with children when evaluating children's desires).

## 2. Current and Future Physical and Emotional Needs and Current and Future Physical and Emotional Danger

### a. *Condition of Home*

A child's need for a safe and stable home is a paramount consideration in assessing the best interest of the child. *See In re L.W.*, 2019 WL 1523124, at *18; *see also* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *Adams v. Tex. Dep't of Fam. & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment).

Before entering DFPS's care, J.H. lived with mother in an apartment. According to DFPS investigator Benitez, the apartment was a one-bedroom apartment that was cluttered and had broken glass on the floor. It had working utilities and there was food in the apartment, but J.H. was barefoot in the mother's

apartment while there was broken glass on the floor. *See In re A.L.*, 545 S.W.3d 138, 148 (Tex. App.—El Paso 2017, no pet.) (home's unsafe conditions, including clutter, relevant in determining emotional and physical needs of child and emotional and physical danger to child). Further, J.H. was unkempt. His clothes were not clean, his hair was not combed, and it appeared that J.H. did not bathe.[19] *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(D) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills); *In re A.T.*, 406 S.W.3d at 371–72 (poor hygiene may constitute condition that endangers child's physical and emotion well-being); *In re Z.G.*, No. 11-11-00078-CV, 2012 WL 745090, at *4 (Tex. App.—Eastland Mar. 8, 2012, no pet.) (mem. op.) (parent unable to provide safe environment for children where children's hygiene was poor); *In re C.M.W.*, 2003 WL 579794, at *5 (children's basic needs include cleanliness and clothing). According to Danys, when J.H. left mother's apartment on November 25, 2020, he was not wearing a shirt or socks.

b.  *J.H.'s Medical, Dental, and Other Needs*

A child's basic needs include medical and dental care. *See In re M.A.A.*, 2021 WL 1134308, at *23; *In re K.S.O.B.*, 2019 WL 1246348, at *19. In deciding that

---

[19]  Child Advocates representative Gonzalez also testified that when J.H. entered DFPS's care, he was not clean.

the termination of parental rights is in the best interest of a child, the trial court may consider evidence that a parent neglected to seek appropriate medical or dental care for her child. *See In re M.A.A.*, 2021 WL 1134308, at *23; *In re K.S.O.B.*, 2019 WL 1246348, at *19; *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see also* Tex. Fam. Code Ann. § 263.307(b)(12)(A), (F) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills including providing health care and understanding child's needs). Likewise, the trial court may infer from a parent's past inattention to her child's medical and dental needs that such inattention will continue in the future. *See In re M.A.A.*, 2021 WL 1134308, at *23; *In re K.S.O.B.*, 2019 WL 1246348, at *19; *In re L.G.R.*, 498 S.W.3d 195, 205–06 (Tex. App.— Houston [14th Dist.] 2016, pet. denied); *In re J.R.W.*, 2013 WL 507325, at *9; *see also In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet denied) (fact finder may infer that past conduct endangering child's well-being may recur in the future if child returned to parent).

DFPS caseworker Cherry testified that J.H. "never brushed his teeth" while in mother's care, and his teeth were rotten and decaying when he was removed from mother's care. J.H. had never received dental care while he was in mother's care, and J.H.'s medical records showed that mother had neglected his dental care for

years. Because of the neglect of J.H.'s dental care, J.H. had "extensive dental work" after he was removed from mother's care. He "received caps on many teeth and silver caps." The dental work required medical sedation.

Chery also testified that J.H. had never received any immunizations while in mother's care, and mother did not give Cherry a reason for her failure to vaccinate J.H. And J.H. had a speech delay. When J.H. entered DFPS's care, he could not speak English or Spanish; he spoke "gibberish." J.H. had not received any speech therapy services while he was in the care of mother. *See In re M.A.A.*, 2021 WL 1134308, at *28 (in discussing best interest of children, noting mother had failed to help her children achieve certain developmental milestones and had not sought help for children).

DFPS investigator Benitez testified that when she saw J.H. in November 2020, he was not able to complete a full sentence. He had "marks on" his face and "scratches over his body." His teeth were brown and looked rotten, and it did not appear that J.H. had ever been to a dentist. Child Advocates representative Gonzalez similarly testified that when J.H. entered DFPS's care, his teeth were "rotten."

Danys, mother's oldest adult-son, confirmed that when J.H. was in mother's care, his teeth had "become black." Danys stated that this was because mother had given J.H. "iron pills" and J.H.'s teeth were "not washed well." Although Danys had bought J.H. a toothbrush, the "darkness" did not come off with brushing or get

better.  Danys acknowledged that J.H.'s teeth were "very bad" and that J.H. needed to see a dentist, but he stated that no one in the family ever took J.H. to the dentist.

Mother admitted that she did not take J.H. to the dentist or to the doctor when he was in her care.  *See In re K.S.O.B.*, 2019 WL 1246348, at *19 (trier of fact can infer from parent's past inattention to child's medical needs that such inattention will continue in future); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (trial court may measure parent's future conduct by past conduct).

The May 2022 permanency report states, based on J.H.'s mental health assessment, that J.H.'s caregivers must be able to provide him with a nurturing, structured, and consistent environment.  J.H.'s caregivers should provide age-appropriate play and learning activities to promote J.H.'s developmental progress.  J.H. needed to attend dental appointments regularly to promote and maintain good dental hygiene and health.  There was no evidence presented at trial that these needs would be met if J.H. was returned to mother's care.  *See In re E.D.*, 419 S.W.3d at 620 (trial court may measure parent's future conduct by past conduct).

c.    *Violence and Abuse*

A child's exposure to violence in the home undermines the safety of the home environment and is relevant when considering the best interest of the child.  *See In re L.W.*, 2019 WL 1523124, at *19; *In re A.K.*, Nos. 07-17-00353-CV, 07-17-00354-CV, 2018 WL 912703, at *5 (Tex. App.—Amarillo Feb. 15, 2018, pet.

denied) (mem. op.). Further, a parent's violent behavior while a child is in the home places the child in severe emotional danger. *See In re S.B.*, 207 S.W.3d 877, 886–87 (Tex. App.—Fort Worth 2006, no pet.). A parent's past performance as a parent is relevant to a determination of her present and future abilities to provide for a child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.W.*, 2019 WL 1523124, at *19; *In re E.D.*, 419 S.W.3d at 620 (trial court may measure parent's future conduct by past conduct); *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

DFPS investigator Benitez testified that on November 25, 2020—the day J.H. was found outside of his home—a third party saw mother hit J.H. in the face with a cane after the third party walked J.H. back to mother's apartment and returned J.H. to mother's care. The third party told Benitez that mother "slapped [J.H.] across the face with her cane aggressively."[20] Mother denied hitting J.H. with a cane.[21] But

---

[20] DFPS caseworker Cherry testified that mother used a cane to walk after suffering a stroke and recounted the same incident of mother striking J.H. with a cane during her testimony. But Cherry stated that J.H. did not have any visual marks from being struck in the face with the cane. *But see In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied) (child need not actually suffer injury to be endangered).

[21] In a bench trial, the trial court as the trier of fact weighs the evidence, assesses the credibility of witnesses, and resolves conflicts or inconsistences. *In re S.J.R.-Z.*, 537 S.W.3d 677, 691 (Tex. App.—San Antonio 2017, pet. denied); *see also In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (trial court, as trier of fact, entitled to disbelieve parent's testimony and version of events).

when Benitez saw J.H. three days later, on November 28, 2020, she saw "marks on" J.H.'s face and "scratches over his body." *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family and others with access to child's home); *In re L.W.*, 2019 WL 1523124, at *14 ("[A]busive conduct by a parent or other person in the children's home may produce an environment that endangers the physical and emotional well-being of the children."); *In re G.P.*, No. 01-16-00346-CV 2016 WL 6216192, at *11 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op.) ("Direct physical abuse is clearly conduct that endangers a child."); *see also In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("Evidence of past misconduct . . . can be used to measure a parent's future conduct."); *Clements v. Haskovec*, 251 S.W.3d 79, 87 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (in parental-termination cases, evidence that parent in past engaged in abusive conduct permits inference parent will continue behavior in future).

**3. Parental Abilities, Plans for Child, Stability of Proposed Placement, and Availability of Assistance**[22]

a. *Mother's Supervision of J.H.*

According to DFPS investigator Benitez, on November 25, 2020, J.H., who was four years old at the time, ran out of mother's apartment and was sitting on the street curb in front of his apartment complex for hours. J.H. ran across a main street, in front of oncoming traffic, to a store and stole an ice cream. J.H. then began to walk back across the main street in front of oncoming traffic. A third party was able to stop J.H. and walk him back across the street. The third party walked J.H. to mother's apartment and knocked on the door to return J.H. to mother. Mother told the third party that J.H. was "always running out." When J.H. was back in mother's care, the third party saw mother aggressively slap J.H. across the face with a cane. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(C) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills, such as "supervision consistent with the child's safety"); *In re A.J.B.*, No. 10-18-00274-CV, 2018 WL 6684808, at *3 (Tex. App.—Waco Dec. 19, 2018, no pet.) (mem. op.) ("[Y]oung children are particularly vulnerable if left in the custody of a parent who is unable or unwilling to protect

---

[22] Much of the evidence discussed above is also relevant to mother's parental abilities, mother's plans for J.H., and the stability of the proposed placements for J.H. *See* TEX. R. APP. P. 47.1.

them or attend to their needs because they have no ability to protect themselves.");

*In re S.B.*, 207 S.W.3d at 886 (parent's poor judgment may be considered in discussing child's best interest); *In re C.M.W.*, 2003 WL 579794, at *5 (children's basic needs include appropriate supervision).

When Benitez spoke to Danys, mother's oldest adult-son, about the November 25, 2020 incident, he reported that on November 25, 2020, mother told Danys that she was depressed and "needed company," so Danys left J.H. with mother instead of taking J.H. to a babysitter when he went to work.[23] Mother admitted to Benitez that J.H. ran out of her apartment on November 25, 2020 while he was under her supervision.

Benitez also testified that J.H. had managed to get out of mother's apartment on other occasions, leaving him outside without parent or caregiver supervision. Prior to the November 25, 2020 incident, on another day, while J.H. was living with mother and Danys, Danys left J.H. with mother while he was at work. Because mother had a stroke about three months before, she had lost mobility in half of her

---

[23] Danys testified that before the November 25, 2020 incident, J.H. had previously gotten out of mother's apartment and a "safety plan" was put in place under which Danys was supposed to supervise J.H. and not leave him alone with mother. But on November 25, 2020, Danys left J.H. with mother while he went to work because he trusted her to supervise J.H. While under mother's supervision, J.H. got out of the apartment because he was able to unlock the door. J.H. was not wearing a shirt or socks at the time. Mother did not call Danys to report that J.H. had escaped because she could not speak very well.

body. Mother admitted that J.H. left her apartment while he was under her supervision, and she had attempted to run after him but she was physically unable to do so. After this incident, Danys and mother agreed to a "safety plan" with DFPS, which stated that J.H. would no longer be left unsupervised with mother, and he would be taken to a babysitter while Danys was at work. But on November 25, 2020, Danys left J.H. unsupervised with mother, and J.H. escaped from the apartment while he was in mother's care.

Benitez concluded, based on her investigation, that mother was physically unable to care for J.H., and although she had placed the responsibility of J.H.'s care on Danys, her oldest adult-son, he was still young at the time and lacked the maturity and the understanding of DFPS's concerns to keep J.H. safe and unharmed. According to Benitez, while in mother's care, J.H. had been put at risk of being hit, injured, or killed because he had been able to leave mother's apartment unsupervised and cross a main street into oncoming traffic. J.H. had been allowed to "roam[] outside of" mother's apartment for several hours without mother or a caregiver knowing his whereabouts.

b.    *Mother's Ability to Care for J.H.*

DFPS caseworker Cherry testified that three months before J.H. entered DFPS's care, mother had a stroke, which left her paralyzed on the left side of her body. At the beginning of the case, mother used a cane to walk, but, at the time of

59

trial, she no longer used a cane. Yet she still had to "walk fairly slow[ly]." Further, as a result of her stroke, mother "c[ould] only talk so much."[24] Mother was not taking any medications or seeking any sort of treatment or therapy to help her recover from her stroke. Mother told Cherry that "she[] [was] fine and she d[id] not need anything to help with her aftermath [from] the stroke." *See In re A.M.A.*, No. 13-22-00011-CV, 2022 WL 1110993, at *6 (Tex. App.—Corpus Christi–Edinburg Apr. 14, 2022, no pet.) (mem. op.) (holding evidence sufficient to support trial court's finding termination of parental rights in child's best interest where parent admitted she failed to care for her own medical needs and could not provide evidence of how she would care for child's needs); *A.A. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00307-CV, 2021 WL 5893695, at *6 (Tex. App.—Austin Dec. 14, 2021, no pet.) (mem. op.) (considering, in holding evidence sufficient to support trial court's best-interest finding, that parent's disabilities presented obstacles to safe parenting and parent had refused to address those obstacles in therapy); *see also In re J.S.*, No. 11-18-00301-CV, 2019 WL 1837477, at *2 (Tex. App.—Eastland Apr. 25, 2019, no pet.) (mem. op.) (noting parent's failure to meet own medical needs created dangerous situation for her children).

---

[24] Child Advocates representative Gonzalez testified that she was unable to communicate with mother and when she tried to ask mother questions, mother did not appear to understand.

60

Because of mother's health status, Cherry expressed concern about mother's ability "to keep up with [J.H.] because he [was] super active and super hyper."[25] Cherry described J.H. as a "super hyper" boy. Mother's health status prevented her from being able to run after J.H. and prevented her from being able to take J.H. to school. *See C. C. F. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00152-CV, 2020 WL 4929782, at *6–7 (Tex. App.—Austin Aug. 19, 2020, pet. denied) (mem. op.) (in holding evidence sufficient to support trial court's finding termination of parental rights was in best interest of child, noting parent's physical limitations raised concerns about whether she could care for child).

Cherry also noted, as to the November 25, 2020 incident, that mother was not able to "get" J.H. after he escaped from her apartment due to her health limitations.[26] *See In re E.D.*, 419 S.W.3d at 620 (trial court may measure parent's future conduct by past conduct); *see also In re S.R.*, 452 S.W.3d 351, 367 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (considering parent's failure to appreciate need for treatment to combat history of mental instability and explaining trier of fact could thus infer that parent's mental health issues would likely continue and further jeopardize children's well-being). According to Cherry, mother was unable to care

---

[25] Danys also testified that J.H. was a hyperactive child.

[26] Mother acknowledged that on November 25, 2020 she saw J.H. open the door and run out of the apartment, but she could not walk.

for J.H. on her own; she could not play with him, throw a ball with him, or walk to the park with him. Mother spent the majority of her time sitting and she was unable to chase after J.H. if needed.

Child Advocates representative Gonzalez testified that mother was not capable of being J.H.'s primary caregiver because of her previous stroke. If J.H. was returned to mother's care, Gonzalez did not think that mother, who did not drive, would be able to take J.H. to the doctor on her own or that she would be able to get J.H. to school.

Mother's FSP states that mother previously suffered a stroke that left half of her body paralyzed. And mother, while J.H. was in her care, "continue[d] to leave [J.H.] without . . . appropriate parental care or adult supervision" placing him at risk of danger and possible neglect. The Child Advocates report states that representatives from Child Advocates had attempted to speak with mother about the status of the case and permanency options for J.H., but mother had limited speech due to her stroke and she had difficult communicating verbally.

As to mother's health status, Danys testified that mother's condition, by the time of trial, had improved. She "talk[ed] better" and no longer needed "her walking stick or [her] wheelchair." But she still had difficult moving one of her hands. Mother was able to understand sentences and was able to go outside her apartment alone. Mother could dress herself, put on makeup, and walk to buy food from a

nearby store. However, Danys acknowledged that mother could not live independently, she could not supervise J.H. alone without additional help, and she could not take J.H. to any doctor or dentist appointments by herself.

Mother testified that her condition had improved, and at the time of trial, she could go shopping and buy food by herself at a store that was not far away from her apartment. But she acknowledged that she needed her attorney to help her walk in the courtroom, and she needed help caring for J.H. if he was returned to her care.[27] *See In re J.A.A.*, No. 14-18-00530-CV, 2018 WL 6614236, at *7 (Tex. App.—Houston [14th Dist.] Dec. 18, 2018, no pet.) (mem. op.) (in holding evidence sufficient to support trial court's finding that termination of parental rights in children's best interest, considering that parent's stroke during case had rendered him physically unable to attend to children's needs). Mother did not know the address of the apartment that she lived at or the name of the apartment complex where she lived. She did not know what grade J.H. would be entering in the fall. According to mother, she did not receive medical services following her stroke. *Cf. T.V.N. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-13-00806-CV, 2014 WL

---

[27] We note that the fact that mother suffers from certain physical limitations does not automatically render her unable to care for J.H. *See, e.g.*, *In re L.C.L.*, 599 S.W.3d 79, 88 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("[T]he existence of . . . disorders and disabilities [does not automatically] constitute evidence of [parent's] inability to provide for children's emotional or physical needs."). But here, mother, in addition to other evidence presented at trial, acknowledged her inability to care for J.H.

1285772, at \*2, \*5 (Tex. App.—Austin Mar. 27, 2014, no pet.) (mem. op.) (noting parent had a history of failing to properly attend to her own medical needs); *see also In re E.R.G.*, No. 11-20-00248-CV, 2021 WL 1807332, at \*3 (Tex. App.—Eastland May 6, 2021, no pet.) (mem. op.) (parent's failure to seek treatment or properly take medication for mental health issues endanger child's physical or emotional well-being).

c.      *Mother's Proposed Placement for J.H.*

Mother testified that, at the time of trial, she lived with Danys, her oldest adult-son, Romero, her second-oldest adult-son, Danys's girlfriend, and Danys's child.  Mother stated that Danys could take care of J.H. if he was returned to mother's care or that Danys's girlfriend could take care of J.H.  But mother did not have any other family members that could help care for J.H.

Danys, who was about twenty-one years old at the time of trial, testified that he worked either five or six days a week from 6:30 a.m. until 2:30 p.m., but on some days, he had to stay later than 2:30 p.m.  Danys could drive a car, but he did not have a driver's license.

Danys stated that he lived with his girlfriend and their child along with Romero and mother in an apartment.[28]  Romero, who was about nineteen years old

---

[28]     This was not the same apartment that mother, Danys, and J.H. were living in when J.H. was removed from mother's care.

at the time of trial, worked from 7:00 a.m. to 8:00 p.m. and also did not have a driver's license. Danys's apartment had two bedrooms. According to Danys, mother and J.H. could live in one bedroom and Danys, his girlfriend, and their child could live in the other bedroom. *Cf. A.A.*, 2021 WL 5893695, at *6 (although condition of parent's home may have improved, holding evidence sufficient to support trial court's finding that termination of parental rights in child's best interest). The apartment did not have a bed for J.H., but Danys testified that the family could buy a bed so that J.H. and mother had their own beds on which to sleep. Romero slept on the conch in the living room. Danys was responsible for paying for the apartment. The apartment did not have locks on the door, but if J.H. was returned to mother's care, the family would put a lock on the door so that J.H. would not be able to get out. *See In re L.J.M.*, Nos. 01-18-00140-CV, 01-18-00141-CV, 2018 WL 3884374, at *7 (Tex. App.—Houston [1st Dist.] Aug. 16, 2018, pet. denied) (mem. op.) (considering lack of safety features intended to keep children from surreptitiously leaving house in analyzing best interest); *In re J.M.*, 156 S.W.3d 696, 707 (Tex. App.—Dallas 2005, no pet.) (parent's inability to keep house safe for children put children in physical danger); *see also Smith v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00598-CV, 2003 WL 22096141, *4 (Tex. App.— Austin Sept. 11, 2003, no pet.) (mem. op.) (DFPS worker testified that failure to have lock on front door was safety concern).

According to Danys, his girlfriend stayed at home caring for their child during the day, and she was willing to take care of J.H. Danys's girlfriend would supervise J.H. and take him to school. But Danys's girlfriend also watched one or two other children and took care of mother while Danys was at work. Danys stated that his girlfriend was willing to help with J.H. "because there[] [was] not another person that could do it." Either Danys or Romero would take J.H. to doctor appointments or dentist appointments. But Danys acknowledged that he had difficulty even attending visits with J.H. during the pendency of the case because of his work schedule and he had trouble helping mother complete the requirements of her FSP because he spent all day working.

DFPS investigator Benitez testified that Danys lacked the maturity and the understanding of DFPS's concerns to keep J.H. safe and unharmed. And Danys had previously signed a "safety plan," agreeing to not leave J.H. unsupervised with mother. But Danys did exactly that on November 25, 2020 when J.H. left mother's apartment unsupervised and ran into traffic.

DFPS caseworker Cherry expressed concern about mother's support system, which consisted of Danys and Romero, because Danys and Romero "work[ed] pretty much all day every day," which made it difficult for them to provide mother with support. Cherry also testified that she did not believe that Danys, Romero, and Danys's girlfriend would be able to help mother take care of J.H. if he was returned

66

to mother's care because Danys and Romero were "always gone to work" and Danys's girlfriend had recently had a child and "ha[d] not expressed any desire to help care for" J.H. Neither Danys nor Romero had designated anyone who would be responsible for J.H. if he was returned to mother's care.

Child Advocates representative Gonzalez testified that Danys and Romero had spoken to Gonzalez about having Danys's girlfriend approved as a babysitter for J.H., if he was returned to mother's care, but Gonzalez testified that Danys's girlfriend had an infant child, who was ten months old, and also babysat for two other children who were toddlers. Further, Gonzalez explained that Danys, who was about twenty-one years old at the time of trial, and Romero, who was about eighteen years old at the time of trial, both worked Monday through Saturday, so neither of them could serve as a primary caretaker for J.H. According to Gonzalez, no one in mother's family had identified themselves as the person who would be a primary caretaker for J.H., i.e., the person who would be "the full-time responsible person" for J.H., if he was returned to mother's care.

d. *Current Placement*

Child Advocates representative Delgado testified that J.H. lived with his foster parents in a ranch-style house on acreage. The house had a large front yard and the property was fully fenced. The home had three or four bedrooms, a dining room, kitchen, and family room. J.H.'s foster parents had two dogs, and J.H. was

the only child living in the home. *See In re J.M.*, 156 S.W.3d at 708 (holding evidence sufficient to support trial court's best-interest finding termination of parental rights in child's best interest where "[t]he evidence show[ed] the foster parents' home [was] stable").

Delgado explained that J.H. was comfortable in his home with his foster parents and J.H. interacted with his foster parents "really well." J.H. referred to his foster mother as "mom" and his foster father as "dad." *See In re S.H.*, 2022 WL 17254956, at *21 (child referred to placement family as "[m]om" and "[d]ad" (internal quotations omitted)); *In re G.J.A.*, No. 13-22-00209-CV, 2022 WL 3092177, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 4, 2022, no pet.) (mem. op.) (in holding sufficient evidence to support trial court's finding termination of parental rights in children's best interest, considering evidence showed that children were thriving in current placement, placement was meeting all of the children's needs, children called their foster parents "mom and dad," and children were bonded with foster family (internal quotations omitted)); *J.D.S. v. Tex. Dep't of Fam. & Protective Servs.*, 458 S.W.3d 33, 44–45 (Tex. App.—El Paso 2014, no pet.) (noting, in holding evidence was sufficient to support trial court's finding termination of parental rights in child's best interest, that child was thriving in placement, she considered her foster parents to be her "mom and dad," and child was improving while in DFPS's care (internal quotations omitted)). J.H. sat on his foster father's

lap during Delgado's visit with him. *In re S.H.*, 2022 WL 17254956, at \*14 ("A child's bond with his placement family implies that the child's desires would be fulfilled by adoption by the placement family."); *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at \*9–10 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.) (evidence child bonded with adoptive placement family and happy living with them weighed in favor of terminating parental rights).

Delgado could speak to J.H. in both Spanish and English, and J.H. would respond to her in either Spanish or English. Delgado described J.H. as very talkative. J.H. played soccer, and his foster parents had flash cards, writing tablets, and toys for J.H. J.H. told Delgado that his foster mother helped him brush his teeth. *See In re S.H.*, 2022 WL 17254956, at \*21 (considering no concerns about child's dental hygiene while he was with placement family).

According to Delgado, J.H. was happy at school, and he attended the same school where his foster mother taught. J.H. had struggled in his Spanish-only-speaking class, and his foster mother had told Delgado that she and J.H.'s foster father were going to place J.H. in an English-only-speaking class in the upcoming school year. J.H.'s foster mother planned to work with J.H. during the summer to make sure that he was on target and did not fall behind in school. J.H. told Delgado that he was sad that it was summer and he was not at school.

Delgado stated that J.H. seemed calmer now that he was in his foster parents' care. J.H.'s foster parents had been working with J.H. on manners and sitting at the table to eat.

DFPS caseworker Cherry testified that J.H. was placed with foster parents who wanted to adopt him. J.H. was doing well in his foster parents' home. He was in kindergarten and was adjusting to his new school. He spoke both English and Spanish, and his Spanish-language skills had improved in his placement with his foster parents. *See In re P.G.D.*, No. 04-19-00896-CV, 2020 WL 2543310, at *5 (Tex. App.—San Antonio May 20, 2020, pet. denied) (mem. op.) (considering children were in loving foster home that was meeting their needs and children were making developmental and academic progress). J.H. was good at math and was very smart. Cherry noted that when J.H. first entered DFPS's care, he was timid and shy, but now he was "super hyper, super loving" and a "very good boy."

Cherry further testified that when J.H. entered DPFS's care, he had a speech delay and he could not speak English or Spanish. But, while in DFPS's care, he had participated in speech therapy services, and his speech had improved. He was now able to understand what was being asked of him and was able to identify things. He spoke "very well."

As to J.H.'s foster parents, Cherry stated that the foster parents were bilingual. J.H.'s foster father worked at a chemical plant, and J.H.'s foster mother was a

teacher. *See In re M.R.H.*, No. 07-15-00089-CV, 2015 WL 3463025, at *4 (Tex. App.—Amarillo May 26, 2015, pet. denied) (mem. op.) (considering as evidence of foster family's ability to care for child that foster father was gainfully employed). J.H. attended the same school where his foster mother taught. Cherry did not have any concerns about J.H.'s foster parents' home and stated that it was DFPS's goal for J.H. to be adopted by his foster parents.

Child Advocates representative Gonzalez testified that J.H. was doing well in in his foster parents' home and his foster parents were taking good care of him. Gonzalez did not believe that mother was able to provide the same level of care to J.H. At the time of trial, J.H. had been living with his foster parents for about two months, and the placement was an adoptive placement for J.H.

The May 2022 permanency report states that J.H. was adjusting to his foster parents' home and he was eating and sleeping well. He was a bright, sweet, and happy child who enjoyed playing with toys and meeting new people. J.H. was hyperactive and learning to follow the rules when he did not get his way. J.H. attended medical and dental appointments while in the care of his foster parents. *See In re A.A.*, No. 02-17-00307-CV, 2018 WL 771972, at *6 (Tex. App.—Fort Worth Feb. 8, 2018, no pet.) (mem. op.) (considering evidence foster parents took child to all her appointments and were meeting her medical needs).

71

According to the permanency report, J.H. was attending kindergarten and adjusting well to his school and learning a lot. He was learning Spanish at school and in speech therapy at home, but he preferred to speak English. J.H.'s mental health assessment recommended that J.H.'s caregivers provide him with age-appropriate play and learning activities to promote J.H.'s developmental progress.

The Child Advocates report states that Child Advocates recommended that J.H. remain in his current placement because his foster parents were meeting his needs and he appeared to be comfortable in the home. J.H. was eating and sleeping well, and he had adjusted to school. J.H.'s foster parents wanted to adopt J.H. *See In re T.M.R.*, No. 13-21-00144-CV, 2021 WL 4998438, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 28, 2021, no pet.) (mem. op.) ("A factfinder may consider the consequences of [the] failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur."); *In re L.W.*, 2019 WL 1523124, at *23 (in holding evidence sufficient to support trial court's best-interest finding, considering children were placed in adoptive home with foster parents who wanted children to continue living with them); *see also In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest.").

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of J.H. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of J.H. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights was in J.H.'s best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of J.H.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in the best interest of J.H. *Id.*

We overrule mother's third issue.

### Managing Conservatorship

In her fourth issue, mother argues that the trial court erred in appointing DFPS as J.H.'s sole managing conservator because either mother, Danys, or Romero should have been appointed.

73

The Texas Family Code provides that "[i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE ANN. § 161.207(a); *see also In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *8 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) ("When the parents' parental rights have been terminated, [Texas] Family Code section 161.207 governs the appointment of a managing conservator."). Generally, we review a trial court's conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

Importantly, an order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to her child. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.). A parent with no legal rights with respect to her child lacks standing to attack the portion of the trial court's order appointing DFPS as the sole managing conservator of the child. *See In re A.L.J.*, 2019 WL 4615826, at *9.

Here, we overruled mother's complaint that the trial court erred in terminating her parental rights to J.H. because the evidence is legally and factually insufficient to support the trial court's findings that mother knowingly placed, or knowingly

allowed J.H. to remain, in conditions or surroundings which endangered his physical or emotional well-being and termination of her parental rights was in the best interest of J.H.  *See id.* ("Once we overrule a parent's challenge to the termination order, the trial court's appointment of [DFPS] as sole managing conservator may be considered a 'consequence of the termination' . . . ."); *In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] Nov. 13, 2014, pet. denied) ("A trial court does not abuse its discretion in appointing [DFPS] as conservator of the children where the evidence is sufficient to support termination of parental rights."); *Quiroz v. Dep't of Fam. & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.) (refusing to address parent's complaint evidence insufficient to support DFPS's appointment as sole managing conservator where evidence sufficient to support termination of parent's rights).  Thus, the trial court's order terminating mother's parental rights divested her of her legal rights and duties to J.H.  *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, 2019 WL 4615826, at *9 ("Because we have overruled [parent's] challenge to the portion of the trial court's order terminating her parental rights, the order has divested [her] of her legal rights and duties related to [the children]."); *In re L.M.N.*, 2018 WL 5831672, at *26; *E.A. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (mem. op.).

Having no legal rights with respect to J.H., we hold that mother lacks standing to challenge the portion of the trial court's order appointing DFPS as sole managing conservator of J.H. *See In re C.A.J.*, No. 01-19-00704-CV, 2021 WL 243900, at *21 (Tex. App.—Houston [1st Dist.] Jan. 26, 2021, pet. denied); *In re A.L.J.*, 2019 WL 4615826, at *9 ("[Parent] d[id] not have standing to challenge the portion of the order appointing [DFPS] as permanent managing conservator of the children because any alleged error could not injuriously affect her rights."); *In re Y.V.*, No. 02-12-00514-CV, 2013 WL 2631431, at *1–2 (Tex. App.—Fort Worth June 13, 2013, no pet.) (mem. op.).

We overrule mother's fourth issue.

## Conclusion

We affirm the order of the trial court.

Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Countiss and Rivas-Molloy.

76